### THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **Global Capital Markets Advisors, LLC** | * | |
| **600 Cameron Street** | * | |
| **Alexandria, VA 22314,** | * | |
| | * | |
| **and** | * | |
| | * | |
| **CARc Job Fund-I, LLC** | * | **Case No.**   1:14-CV-01721 |
| **600 Cameron Street** | * | |
| **Alexandria, VA 22314,** | * | |
| | * | |
| **and** | * | |
| | * | |
| **CARc Job Fund – The Wharf Project** | * | |
| **Loan Series, LLC,** | * | |
| **600 Cameron Street** | * | |
| **Alexandria, VA 22314,** | * | |
| | * | |
| **Plaintiffs** | * | |
| | * | |
| **v.** | * | |
| | * | |
| **Hoffman-Struever Waterfront, LLC** | * | |
| **690 Water Street, SW** | * | |
| **Washington, D.C. 20024,** | * | |
| | * | |
| **SERVE ON RESIDENT AGENT** | * | |
| **LPRA, Inc.** | * | |
| **4725 Wisconsin Avenue** | * | |
| **Suite 250** | * | |
| **Washington, DC  20016** | * | |
| | * | |
| **Defendant** | * | |
| | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### VERIFIED COMPLAINT

Plaintiffs, Global Capital Markets Advisors, LLC ("GCMA"), CARc Job Fund-I, LLC

(the "Master Series LLC"), and CARc Job Fund – The Wharf Project Loan Series, LLC (the

"Fund"), hereby sues Defendant, Hoffman-Struever Waterfront, LLC ("HSW"), and state as follows:

## INTRODUCTION

1.     This is an action to specifically enforce the loan commitment agreement between the Plaintiffs and HSW.  HSW is the developer in charge of a multi-phased real estate project in the District of Columbia known as the Wharf ("The Wharf").  In 2012, HSW and GCMA entered into a loan commitment agreement, pursuant to which GCMA agreed to use its reasonable best efforts to raise capital to be loaned to and used by HSW in connection with the development of The Wharf, and HSW agreed to borrow all funds, up to $100 Million, that GCMA raised, subject to the terms of the loan commitment.

2.     After GCMA spent over two years working to raise capital for The Wharf, including successfully raising millions of dollars from foreign investors as part of a federal immigration investment program, HSW wrongfully and in bad faith breached the loan commitment, refused to cooperate, and now refuses to borrow the funds raised by GCMA in accordance with the terms of the loan commitment.  HSW's refusal to borrow the money will result in catastrophic and irreparable financial loss to GCMA.   It will also cause irreparable harm to the foreign investors who have invested in the Fund and have (or would have) applied for legal residency in the United States as a part of the immigration investment program but for HSW's breach.

## THE PARTIES

3.      GCMA is a limited liability company organized under the laws of the State of Delaware that maintains its principal place of business in the Commonwealth of Virginia. GCMA directs, controls, and coordinates the vast majority of its activities out of its principal place of business located in Virginia.

4.      The Master Series LLC is a Delaware Series Limited Liability Company (a "Series LLC") organized under the laws of the State of Delaware in accordance with Del. Code § 18-215. A Series LLC is a limited liability company that is permitted to own multiple subsidiary limited liability companies or a "series" of limited liability companies, which among other things, eliminates the need to register and formally form numerous limited liability companies and pay the costs attendant with such registration and formal formation.

5.      The Fund is a separate limited liability series company formed and affiliated under the Master Series LLC in accordance with the Delaware Limited Liability Company Act.

6.      The Master Series LLC and the Fund maintain their principal places of business in the Commonwealth of Virginia.  The Master Series LLC and The Fund direct, control, and coordinate the vast majority of their activities out of its principal place of business located in Virginia.

7.      HSW is a limited liability company organized under the laws of the District of Columbia that maintains its principal place of business in the District of Columbia.

## JURISDICTION AND VENUE

8.      This Court has diversity jurisdiction over this matter, pursuant to 28 U.S.C. § 1332, because all of the plaintiffs are diverse from the defendant and the amount in controversy exceeds $75,000.00.  HSW is a resident of the District of Columbia and neither GCMA, the

3

Master Series LLC, nor the Fund are residents of the District of Columbia. Additionally, the value of the contract sought to be enforced is $100,000,000.00, which exceeds $75,000.00, and the damages suffered by the Plaintiffs as a result of HSW's conduct far exceed $75,000.00.

9.      Venue is appropriate in the District of Columbia, pursuant to 28 U.S.C. § 1391, because the Defendant resides in the District of Columbia.

10.     This Court has personal jurisdiction over HSW because it is domiciled in the District of Columbia and regularly transacts business within the District of Columbia.

## STATEMENT OF FACTS

### A. The Project.

11.     The Wharf is a multi-phased real estate project in the District of Columbia that includes a mix of retail, restaurant, entertainment, commercial, hospitality, and residential uses.

12.     HSW is the master developer of The Wharf, pursuant to a ground lease and an Amended and Restated Land Disposition Agreement, dated May 13, 2009.

13.     The first phase of the project is the development of 6.5 +/- acres of land between 7th and 11th Streets and Maine Avenue, S.W., Washington, D.C. 20024 ("Phase 1"), with an anticipated cost of $732,600,000.00.

14.     In an attempt to raise some, but not all, of the $732,600,000.00 for Phase 1, HSW entered into a loan commitment with GCMA.

### B. The Loan Commitment.

15.     GCMA is an entity that, among other things, raises capital using the fifth preference immigrant visa category ("EB-5") created by the United States Government in 1990. EB-5 is a federal immigration program that provides foreign nationals with an avenue towards obtaining legal permanent residency in the United States for themselves and their families.

16.    On April 11, 2012, HSW and GCMA entered into a loan commitment letter relating to The Wharf.  *See* Exhibit A, attached hereto and incorporated herein by reference. Pursuant to the April 11th commitment letter, GCMA was to use its reasonable best efforts to market the Fund to EB-5 investors in an effort to raise at least $75 Million by July 20, 2012, and, thereafter, as much as $230 Million total to be borrowed by HSW as part of the financing of the development of the Wharf.

17.    Shortly after the signing of the April 11th commitment letter, however, it became apparent that, for a variety of reasons, it would be impossible for GCMA to raise $75 Million by July 20, 2012, and that more was needed from both HSW and GCMA in order to successfully launch the Fund's marketing program.

18.    For its part, HSW had not yet, among other things, finalized its business and financing plans nor secured the remainder of its project financing.  And, for its part, GCMA needed to bolster its presence in China and strengthen its ties to international agents in China in order to successfully market the Fund to potential EB-5 investors located there.

19.    As a result, HSW and GCMA agreed to rescind the April 11th commitment letter and replace it with a second loan commitment that, among other things, reduced the amount of the minimum raise, extended the minimum raise date, and provided for advances by HSW to GCMA in order to assist GCMA with bolstering its presence in China.

20.    On September 8, 2012, HSW and GCMA entered into the replacement loan commitment by executing the September 8, 2012 commitment letter and the September 8, 2012 supplemental letter agreement (collectively, the "Loan Commitment").  *See* Exhibits B & C, attached hereto and incorporated herein by reference.

21.     A key component of the Loan Commitment was the acknowledgement that the funds raised by GCMA were to be raised from foreign investors intending to invest $500,000 each (plus fees) and utilize the EB-5 program to obtain permanent legal residency in the United States.  The Loan Commitment provided that GCMA was to provide the loan to HSW "from capital expected to be hereafter contributed to the Fund by 200 accredited foreign investors [ ] seeking to obtain permanent U.S. residency visas under the EB-5 Immigration Services [ ]" (the "Fund Capital").  Ex. B.

22.     To that end, HSW's duties under the Loan Commitment included, among other things, the obligation to: (i) "use reasonable good faith efforts to meet the Loan goals of the Fund and its EB-5 investors, including the material terms and conditions of [the Loan] Commitment"; (ii) permit GCMA to use its reasonable best efforts to raise the Fund Capital without interference or obstruction from HSW; (iii) act in good faith in connection with, and reasonably cooperate with GCMA's efforts to, raise up to $100 Million (reduced from $230 Million) in accordance with the terms of the to-be-agreed-upon loan documentation (the "Loan Documentation"); (iv) negotiate the Loan Documentation for the Loan as provided in the Loan Commitment in good faith and in accordance and consistent with any Project Documentation; and, (v) so long as the Project Documentation did not somehow preclude HSW from borrowing up to $100 Million in accordance with the terms that were substantially contemplated in the Loan Commitment, borrowing all Fund Capital raised by GCMA and deposited in escrow by the Effective Date in accordance with the Loan Documentation for the Loan as provided in the Loan Commitment. *See* Exs. B &C.

23.     In addition to all of the express terms in the Loan Commitment, HSW was also subject to the implied covenant of good faith and fair dealing in working cooperatively with

GCMA to close the loan and to effectuate the ability of the EB-5 investors to obtain U.S. residency.

24.     In recognition of GCMA's need for additional capital in order to bolster its presence and connections in China, HSW agreed to pay GCMA up to $250,000 for expenses incurred in connection with its marketing efforts in China ("Supplemental Expense Reimbursement"), and to advance to GCMA's principal, Michael Sears, $10,000 per month in connection with his marketing efforts of the Fund and The Wharf. Ex. C.

25.     GCMA's obligation under the Loan Commitment was to "use its reasonable best efforts to raise a minimum of at least Fifty Million Dollars ($50,000,000) (the "Minimum Raise") in Fund Capital from EB-5 Investors … on or before December 20, 2012 (the "Minimum Raise Date")." Ex. B.

26.     GCMA did not provide any sort of guarantee that it would meet the Minimum Raise by the Minimum Raise Date.

27.     Instead, pursuant to the terms of the Loan Commitment, in the event that GCMA did not meet the Minimum Raise by the Minimum Raise Date, HSW was provided the option to, at any point thereafter, issue a so-called "Loan Cut Off Notice." Unless and until HSW issued a Loan Cut Off Notice, GCMA remained obligated to continue its Fund marketing efforts. Similarly, as discussed below, even if GCMA issued a Loan Cut Off Notice, HSW remained obligated to borrow all Fund Capital raised by and deposited in escrow with GCMA up to the "Effective Date" of the Loan Cut Off Notice.

28.     Pursuant to the terms of the Loan Commitment, HSW also had the right to fund the project from other financial sources in addition to the GCMA loan. As a result, unlike the original commitment letter, the September 8th Loan Commitment stated that Closing and

funding of the GCMA Loan was to be "deferred until the closing of all such other sources of financing for Phase 1 of the Project." Ex. C.

29.     Once the Fund Capital was raised, the parties were thereafter required to negotiate the fine points of the loan documents in good faith in accordance with the agreed upon financial terms set forth in the Loan Commitment, and to close on the loan. Ex. C.

### C.     Loan Cut Off Notice.

30.     A Loan Cut Off Notice was the single remedy available to HSW in the event that GCMA was unable to meet the Minimum Raise by the Minimum Raise Date and HSW wished to cease GCMA's future marketing efforts and cap the amount that HSW was obligated to borrow. Exs. B&C.

31.     Recognizing that the "Loan goals of the Fund and its EB-5 investors" include meeting the requirements of the EB-5 program, the Loan Commitment makes clear that a Loan Cut Off Notice has the effect of ceasing GCMA's *future* marketing efforts only, and it still obligates HSW to borrow all Fund Capital raised by GCMA and deposited into GCMA's escrow account within 5 business days following the delivery of the Loan Cut Off Notice to GCMA (the "Effective Date"). The purpose of this is to ensure that all EB-5 investors who had committed to the Fund and had begun the USCIS EB-5 application process will be included in the project so that they can meet the requirements of the EB-5 program and not have their EB-5 applications necessarily denied. Ex. B.

32.     For this reason, the issuance of a Loan Cut Off Notice has very specific requirements designed to ensure that those investors that have already committed to participating in the Fund will be included.

33.     First, a Loan Cut Off Notice must state that HSW is terminating the marketing efforts of GCMA.  Anything less is not a Loan Cut Off Notice.  Ex. B.

34.     Second, a Loan Cut Off Notice must state that HSW will not accept Loan disbursements from GCMA in excess of the amount raised and placed in Escrow by the close of business on the fifth business day following the delivery of the Loan Cut Off Notice (the "Effective Date").  Anything less is not a Loan Cut Off Notice.  Ex. B.

35.     Third, in the event that HSW issued a Loan Cut Off Notice, HSW remained obligated to borrow all Fund Capital deposited in escrow with GCMA up through and including the Effective Date.

36.     HSW was also obligated to pay GCMA a "Cancellation Fee" in the event that it issued a Loan Cut Off Notice.  "The Cancellation Fee shall be equal to Twenty Thousand Dollars ($20,000) per month for the period commencing August 1, 2012 and ending on the last day of the month in which the Loan Cut Off Notice is delivered to [GCMA]."  Ex. C.

37.     HSW never issued a Loan Cut Off Notice nor did it pay a Cancellation Fee.

**D.     GCMA's Good Faith Marketing Efforts.**

38.     GCMA fulfilled its obligations to use its best efforts to market The Wharf and to obtain EB-5 investments.  In fact, GCMA went so far as to focus all of its EB-5 marketing efforts solely on The Wharf.

39.     In order to raise the Fund Capital, GCMA, among other things, marketed The Wharf to U.S. immigration attorneys, agents and potential investors in foreign countries seeking to invest in qualifying EB-5 projects within the United States.  During these communications and in-person meetings, GCMA, using disclosure materials that were previously reviewed and approved for such use by HSW and often with the participation and assistance of HSW and its

9

officers and employees, provided agents and potential investors with the disclosure materials and other pertinent information relating to The Wharf, including copies of HSW's business plan(s), agreements demonstrating a commitment by HSW to accept all the EB-5 Capital raised by GCMA, and copies of the Loan Commitment between GCMA and HSW relating to The Wharf.

40.     Through its efforts, and despite the bad faith conduct of HSW described below, GCMA raised nearly $20,000,000 in Fund Capital, of which $12,000,000 is currently held in escrow.  GCMA also received subscription agreements from many other investors prepared to wire their required capital investments upon receipt of an updated TEA Designation letter, defined below, effective for the 2014 calendar year.

41.     GCMA obtained such investments from foreign nationals attempting to obtain U.S. residency through the EB-5 program.  GCMA was able to obtain these investments through its efforts, as well as the previous cooperation and support of HSW.

42.     At the earlier stages of the project, HSW worked cooperatively with GCMA in its marketing efforts, travelled to foreign countries with GCMA to meet with agents and potential investors, and even made representations to these agents and potential investors in support of The Wharf, EB-5, and HSW's commitment to use funds raised by GCMA through the EB-5 program.  Specifically, representatives of HSW, on numerous occasions, represented to agents and potential investors, and their attorneys, among other things, that: a) The Wharf had received TEA Designation approval to qualify EB-5 investors for the reduced $500,000.00 minimum capital investment amount; b) HSW was committed to using EB-5 investment money; c) HSW was committed under the terms of the Loan Commitment to working with GCMA; and d) HSW would utilize as much EB-5 money as GCMA could raise.

43.     These representations were repeated by representatives of HSW to GCMA as late as November 2013.

44.     By the end of 2013, however, HSW's cooperation ended as it devised a scheme to either oust GCMA and the Fund entirely from The Wharf or require them to renegotiate the key financial terms of the Loan Documentation.     Indeed, but for HSW's bad faith conduct and breach of the Loan Commitment, GCMA would have raised the entire $100,000,000 maximum loan amount.

45.     As a result of HSW's bad faith conduct, described in detail below, however, GCMA has suffered irreparable harm to its reputation and good will, has been required to return the escrow deposits of many of the Fund investors, and unless this Court awards the specific performance and injunctive relief sought herein, GCMA will be put out of business and the Fund investors will all have their United States residency applications denied (many even after they have already relocated to the United States).

### E.     The EB-5 Program and TEA Designation.

46.     Under the traditional EB-5 program, a foreign national is required to invest $1 Million in a qualifying new commercial enterprise in the United States that creates or preserves at least ten (10) full time jobs for U.S. citizens in order for the foreign national and his/her spouse and minor children to be granted residency in the United States under the program.

47.     If, however, the area in which the project is located is within a qualified rural area, or in a non-rural location that is experiencing "high unemployment" or has officially been designated as a "Targeted Employment Area" by the designated the chief executive officer of the state, territory or, in this case, the District of Columbia (or their respective authorized designee), where the project investment is located, then the minimum amount of required capital is reduced

to $500,000.00 for each EB-5 investor.  High unemployment is defined in the applicable USCIS regulations as 150% of the national average.

48.     In order for an EB-5 investor to obtain the benefit of the Targeted Employment Area designation ("TEA Designation"), the TEA Designation must be in effect upon the earlier of the filing of the investor's I-526 petition (petition for conditional permanent residency) or the use of the investor's funds in the project.  For the purposes of The Wharf, the applicable time frame is the date of the filing of each investor's I-526 petition.

49.     If the applicable state (or District) government office has not or does not issue a TEA Designation and letter certifying that the project is within a designated TEA, then each EB-5 visa petition has the burden of proving to the USCIS, on an applicant by applicant basis, that the project is located in a location experiencing an unemployment rate of at least 150% of the national average.

50.     If there is no TEA Designation outstanding covering the location of the investment project and the EB-5 applicant does not provide sufficient supporting evidence of "high unemployment" to the USCIS with his or her visa petition, then the investor does not obtain the benefit of the $500,000.00 minimum capital investment, the investor will be deemed by the USCIS to have been required to have invested a minimum of $1,000,000.00 into the project – not just $500,000.00, and the investor's residency application will be denied.

51.     Typically, an investor will file his/her EB-5 visa application (an "I-526 petition") for conditional permanent residency at or soon after the time that he/she deposits his/her capital investment into escrow.  If the USCIS approves the I-526 petition, the investor's capital is released from escrow for investment in the project and his or her conditional residency visa is issued and will be valid for at least two (2) years after he or she established residency in the U.S.

52.     After receipt of the conditional residency visa, the investor must establish a legal residency in the United States within six (6) months.   That residency must be real and substantial.

53.     Thereafter, within 22 to 24 months after establishing residency in the U.S., the investor must submit an application for the removal of conditions on his or her permanent residency visa to the USCIS (the I-829 petition).  The application for removal of conditions must include sufficient evidence that demonstrates, among other factors, that the EB-5 investment has been fully made and utilized in a manner consistent with the investment plan included with the investor's original I-526 petition, and that at least ten (10) full time jobs for United States citizens were created as a direct, indirect, or were induced as a result of, the investment.

### F.     The Wharf's TEA Designation.

54.     Pursuant to Section 204.6 of the Code of Federal Regulations, a project may obtain a TEA Designation by the issuance of a simple letter by the authorized designee of the officer of the state (or District) in which the project is located certifying that the project is within a geographic area that has been designated by that office as a high unemployment area.

55.     In the District of Columbia, the Office of the Deputy Mayor for Planning and Economic Development ("DMPED") has been designated by the Mayor as the authorized officer charged with issuing letters certifying (and re-certifying) that specific projects are located within a Targeted Employment Area.

56.     The Wharf was originally designated by DMPED as within a Targeted Employment Area.

57.     When that original designation was scheduled to expire, HSW, in accordance with its obligations under the Loan Commitment and its representations to potential investors and

their agents, applied for and obtained reaffirmation from the District of Columbia that effective

for the calendar year 2013 the Wharf project is located within its officially designated Targeted

Employment Area.  HSW provided GCMA with a copy of the TEA Designation letter that the

Deputy Mayor for Planning and Economic Development of the District of Columbia

("DMPED") sent officially notifying USCIS that the Wharf was within its Designated TEA and

advising USCIS that its designation was effective for the calendar year 2013.

58.     That designation allowed EB-5 investors to qualify for conditional U.S. residency

under the EB-5 program with a $500,000.00 investment as opposed to a $1,000,000.00

investment, so long as the TEA Designation remained effective at the time each investor filed

his/her respective I-526 application.

59.     The 2013 TEA Designation issued by DMPED expired on December 31, 2013.

60.     As a result, an extension (or continuing confirmation) of the TEA Designation is

required for those investors who subscribed after December 31, 2013 and who intend to deposit,

or have deposited, their capital investments into escrow after that date.

61.     Although DMPED previously certified The Wharf as within a Targeted

Employment Area and that certification was effective through December 31, 2013, DMPED will

not extend (or continuing confirmation) of the TEA Designation unless HSW requests the

certification and submits a letter of support indicating that the developer is in support of using

EB-5 funds for the project.

62.     The sending of a correspondence by HSW requesting an extension and re-

affirmation of the TEA Designation and acknowledging support of the use of EB-5 funds for the

project is merely a pro forma requirement of DMPED in order to meet the requirements of the

USCIS under the EB-5 program.  It is, however, a very real and necessary requirement for any

EB-5 investor intending to submit its I-526 visa petition to USCIS after December 31, 2013.

63.    GCMA has repeatedly demanded that HSW request the continuance of the TEA

Designation from, and submit the required letter of support to, DMPED.

**F.    HSW's Bad Faith Conduct and Breach of the Loan Commitment.**

64.    For months leading up to the TEA Designation expiration date, GCMA and its

representatives repeatedly requested and ultimately demanded that HSW request from DMPED

the reaffirmation of the effectiveness of the TEA Designation covering the Wharf project

location and a letter to that effect be sent to USCIS.

65.    HSW initially represented that it would request the extension/continuance of the

TEA Designation and issue its letter of support, but stated that it was in "sensitive" discussions

and negotiation with the District that took precedence over such a request.

66.    GCMA was assured that once these sensitive negotiations concluded, the TEA

Designation request would be made.

67.    In early 2014, however, GCMA learned that the sensitive negotiations that took

precedence over GCMA and its' EB-5 investors need for the reaffirmation of the Wharf project

TEA Designation were not limited to those with the District, but also included negotiations with

a private equity investment company.

68.    In early 2014, HSW received and then publically announced the commitment of

hundreds of millions of dollars in private equity investment in The Wharf.  Upon knowledge,

information, and belief, upon receiving that commitment, HSW unilaterally and in bad faith

decided that it no longer wished or needed the EB-5 money raised, or to be raised, by GCMA –

at least not upon the terms set forth in the Loan Commitment.

69.     In violation of its obligations under the Loan Commitment, including its duty of good faith and fair dealing and its duty to "use reasonable good faith efforts to meet the Loan goals of the Fund and its EB-5 investors," HSW has refused and continues to refuse to request DMPED to recertify The Wharf's designation as a being within a Targeted Employment Area and has refused to submit the letter of support.

70.     HSW is deliberately refusing to request the re-certification as part of a bad faith effort to frustrate GCMA's performance under the Loan Commitment. HSW's actions are intended to thwart GCMA's ability to raise additional capital from EB-5 investors, and to either oust GCMA and the Fund from the project or pressure GCMA and the Fund into allowing HSW to renegotiate the terms of its commitment. Such bad faith conduct has very real and substantial consequences to GCMA, the Fund, and its investors.

71.     Because of HSW's actions and refusal to either request reaffirmation of the TEA Designation for Wharf, many investors are either in jeopardy of having their visa approvals revoked, or are withholding the filing of their I-526 petitions until the receipt of the TEA Designation, or simply refusing to follow through with their planned investment in The Wharf until they can be provided a copy of a valid and outstanding TEA Designation letter demonstrating that the Wharf is included within its described geographical boundaries and evidence that HSW is working toward an initial closing of the Wharf Project loan with GCMA on behalf of its EB-5 investors.

72.     As a result, GCMA has been crippled in its ability to raise the Fund Capital and, if the TEA Designation letter is not provided as promised to investors, GCMA will suffer irreparable damage to its reputation and business. Worse yet, those investors in the Fund who filed their I-526 petitions after December 31, 2013, or who have not yet filed their I-526 petitions

will have all of their applications under the EB-5 program denied and their ability to legally become residents of the United States will be eliminated.

73.     Had HSW merely desired to cease GCMA's marketing efforts and cap the amount that it was required to borrow from the Fund, HSW could have simply issued a Loan Cut Off Notice.

74.     HSW did not, however, issue a Loan Cut Off Notice, as required by the Loan Commitment to discontinue GCMA's marketing efforts.  HSW did not instruct GCMA to cease marketing and accepting investments.  And HSW did not pay GCMA the required fee under the Letter Agreement.  In fact, at all times after the Minimum Raise Date through and including the Notice of Default letter discussed below, HSW repeatedly represented to GCMA HSW's desire for GCMA to continue to market the Fund and The Wharf and HSW's commitment to borrow as much EB-5 Fund Capital that HSW could raise.

75.     Notwithstanding these representations and commitments, on February 24, 2014, HSW delivered the Plaintiffs a "Notice of Default" to GCMA that purported to place the Plaintiffs on notice of various alleged defaults of their obligations under the Loan Commitment. *See* Ex. D, attached hereto and incorporated herein by reference.

76.     Specifically, HSW claimed that the Plaintiffs were in default of their obligations under the Loan Commitment by: 1) "fail[ing] to arrange in a timely manner Fund Capital in amounts sufficient to enable HSW to acquire the Project and otherwise to satisfy its obligations to the District of Columbia under the LDA"; 2) "fail[ing] to fulfill on a timely basis its commitment to raise $100 Million in Financing"; and 3) "fail[ing] to provide forms of Loan Documentation, which breach has resulted in a failure to agree to the Loan Documentation."

77.     Of course, none of these obligations existed under the Loan Commitment.  To the contrary, the Loan Commitment merely obligated GCMA to use its reasonable best efforts to raise the Minimum Raise by the Minimum Raise Date.  It did not obligate GCMA to raise $100 Million.  Nor did it obligate GCMA to arrange Fund Capital in amounts sufficient to enable HSW to acquire the project.  Indeed, the Loan Commitment specifically provided HSW the right to fund the project from other financial sources in addition to the GCMA loan and the Loan Commitment specifically deferred closing on the GCMA loan until after HSW had secured its "other sources of financing for Phase 1."

78.     HSW's reliance on these non-existent "events of default" reveal HSW's bad faith. Worse yet, pursuant to the terms of the Loan Commitment and the language of the Notice of Default itself, the Notice of Default did not to alter, modify or amend the Loan Commitment, and therefore, GCMA remained obligated continue to market the Fund and the Wharf pursuant the terms of the Loan Commitment.  The Notice of Default was not a Loan Cut Off Notice and the Notice of Default itself specifically stated that it "shall not be deemed an amendment or modification of the Commitment Letter nor as a consent to, or waiver of, any breach, failure or default by GCMA of its obligations under the Commitment Letter."

79.     As a result, upon receipt of the Notice of Default, GCMA remained obligated to continue to market the Fund and The Wharf and in a letter dated March 3, 2014, GCMA expressly informed HSW of its intent to continue its marketing efforts.  *See* Exhibit E, attached hereto and incorporated herein by reference.

80.     Since the issuance of the Notice of Default, GCMA has been actively attempting to convince HSW to act in good faith, honor its obligations under the Loan Commitment, request

the TEA Designation, and commit to borrowing all Fund Capital raised by GCMA in accordance with the terms of the Loan Commitment.

81.     HSW has refused.

82.     From March 2014 through to the filing of this Verified Complaint, GCMA has had numerous communications and face to face meetings with HSW and its representatives seeking to agree upon terms of the Loan Documentation in accordance with the Commitment Letter.

83.     HSW, however, has represented that it will only borrow up to $7.5 Million of EB-5 capital received by GCMA, that it will not borrow any EB-5 capital that is not available for disbursement by an arbitrary deadline sometime in early-to-mid 2015, and that it will not borrow any EB-5 capital unless GCMA agrees to reduce the interest rates and provide more favorable re-payment terms than those set forth in the Loan Commitment.

84.     Although GCMA attempted to negotiate with HSW and was initially willing to alter certain terms of the Loan Commitment in order to ensure that at least 15 of the investors would be included in the loan such that their USCIS petitions would be preserved, the terms proposed by GCMA will necessarily impair the USCIS applications of the investors.

85.     GCMA informed HSW that the re-negotiated terms were unacceptable. HSW, by and through its counsel, informed GCMA that a new proposal would be submitted by at least October 1, 2014. Despite specific inquiry, HSW has failed to deliver a new proposal agreeing to borrow any of the Fund Capital raised by GCMA.

86.     HSW's refusal to borrow the funds in escrow (or to be in escrow) in accordance with the terms of the Loan Commitment, and its refusal to negotiate the terms of the loan in good faith is a material breach of the Loan Commitment.

87.     As a direct and proximate result of HSW's breach, GCMA has and will continue to suffer substantial and irreparable harm.  Similarly, all of GCMA's EB-5 investors will suffer substantial and irreparable harm as their USCIS petitions, whether it be the I-526 or the I-829, will all necessarily be denied.

88.     HSW's actions are a bad faith attempt to sabotage the Loan Commitment and to shirk its responsibilities to accept the Loan from GCMA and/or to pay GCMA the required cancellation fee under the Letter Agreement.  They are deliberate acts seeking to prevent the investors from obtaining EB-5 approval and to prevent GCMA from raising additional funds.

89.     Unfortunately for both GCMA and HSW, HSW's actions create the potential for very real and substantial liability against GCMA, HSW, and The Wharf.

## COUNT I– BREACH OF CONTRACT – SPECIFIC PERFORMANCE

90.     The Plaintiffs incorporate by reference, as if fully restated herein, paragraphs 1 through 89 and further states as follows:

91.     The Loan Commitment is a valid and enforceable agreement between GCMA and HSW.

92.     Pursuant to the terms of the Loan Commitment, HSW was obligated to, among other things: (i) "use reasonable good faith efforts to meet the Loan goals of the Fund and its EB-5 investors, including the material terms and conditions of [the Loan] Commitment"; (ii) permit GCMA to use its reasonable best efforts to raise the fund capital without interference or obstruction from HSW, unless and until HSW issued a Loan Cut Off Notice in accordance with the Loan Commitment; (iii) act in good faith in connection with, and reasonably cooperate with GCMA's efforts to, raise up to $100 Million (reduced from $230 Million) in accordance with the terms of the to-be-agreed-upon Loan Documentation; (iv) negotiate the Loan Documentation for

the Loan as provided in the Loan Commitment in good faith and in accordance and consistent with any Project Documentation; and, (v) so long as any Project Documentation did not somehow preclude HSW from borrowing up to $100 Million in accordance with the terms that were substantially contemplated in the Loan Commitment, borrowing all fund capital raised by GCMA and deposited in escrow by the Effective Date (up to $100 Million) in accordance with the Loan Documentation for the loan as provided in the Loan Commitment.

93.    HSW breached the Loan Commitment by, among other things: (i) acting in bad faith and intentionally sabotaging GCMA's efforts to raise the Fund Capital; (ii) acting in bad faith and intentionally sabotaging the Loan goals of the Fund and its EB-5 investors; (iii) failing to reasonably cooperate with GCMA's efforts to raise the Fund Capital; (iv) refusing to request DMPED to extend (or continue confirmation of) the TEA Designation; (v) refusing to submit a letter of support to DMPED indicating that HSW supports the use EB-5 funds for the project; (vi) issuing a Notice of Default to GCMA alleging breaches of "obligations" that do not even exist under the Loan Commitment; (vii) failing to negotiate in good faith the Loan Documentation for the Loan as provided in the Loan Commitment; (viii) refusing to borrowing all Fund Capital raised by GCMA and deposited in escrow by the Effective Date; (ix) refusing to borrow anything more than $7.5 million of Fund Capital; (x) demanding a reduced interest rate and more favorable repayment terms than those set forth in the Loan Commitment; and (xi) requiring an arbitrary funding deadline as a condition to any loan from the Fund (especially with knowledge that such a deadline would necessarily result in the ultimate rejection of United States residency status to any EB-5 investor whose I-526 petition had not yet been approved as of the deadline).

94.     In addition to the express duties of good faith set forth within the Commitment Letter, HSW was further obligated to conduct itself in accordance with the implied duties of good faith and fair dealing, which required HSW to, among other things, (i) reasonably cooperate with the Plaintiffs' performance under the Loan Commitment; (ii) not intentionally hinder, interfere with, or otherwise frustrate the Plaintiffs' performance under the Loan Commitment; and (iii) not take any action to intentionally destroy or injure the rights of the Plaintiffs to receive the benefits to which they were entitled under the Loan Commitment.

95.     HSW breached the implied duties of good faith and fair dealing by, among other things: (i) acting in bad faith and intentionally sabotaging GCMA's efforts to raise the Fund Capital; (ii) acting in bad faith and intentionally sabotaging the Loan goals of the Fund and its EB-5 investors; (iii) refusing to cooperate with GCMA's efforts to raise the Fund Capital in a concerted effort to frustrate the Plaintiffs' ability to perform under the Loan Commitment; (iv) refusing to request DMPED to extend (or continue confirmation of) the TEA Designation in order to hinder GCMA's ability to raise the Fund Capital; (v) refusing to submit a letter of support to DMPED indicating that HSW supports the use EB-5 funds for the project in order to hinder GCMA's ability to raise the Fund Capital; (vi) issuing a Notice of Default to GCMA alleging breaches of "obligations" that do not even exist under the Loan Commitment in a bad faith attempt to escape HSW's obligations under the Loan Commitment and to frustrate the Plaintiffs' ability to receive the benefits of the Loan Commitment; (vii) negotiating the terms of the Loan Documentation in bad faith; (viii) refusing to borrow anything more than $7.5 million of Fund Capital; (ix) demanding a reduced interest rate and more favorable repayment terms than those set forth in the Loan Commitment; and (x) requiring an arbitrary funding deadline as a condition to any loan (especially with knowledge that such a deadline would necessarily result in

the ultimate rejection of United States residency status to any EB-5 investor whose I-526 petition had not yet been approved as of the deadline).

96.     GCMA, the Master Series LLC, the Fund and its EB-5 Investors have suffered substantial harm as a result of HSW's breach and they will continue to suffer substantial and irreparable harm unless HSW is ordered to specifically perform in accordance with its obligations under the Loan Commitment.

WHEREFORE, Plaintiffs, Global Capital Markets Advisors, LLC, CARc Job Fund-I, LLC, and CARc Job Fund – The Wharf Project Loan Series, LLC request that this Honorable Court enter judgment in their favor and against the Defendant, Hoffman-Struever Waterfront, LLC, and enter an order for specific performance requiring the Defendant to perform its obligations under the Loan Commitment in good faith, to request the continuance of The Wharf's designation as a Targeted Employment Area, negotiate the Loan Documentation for the Loan as provided in the Loan Commitment in good faith and in accordance and consistent with any Project Documentation, and, borrow all fund capital raised by GCMA and deposited in escrow by the Effective Date (up to $100 Million) in accordance with the Loan Documentation for the loan as provided in the Loan Commitment.

## COUNT II – BREACH OF CONTRACT – DAMAGES

97.     The Plaintiffs incorporate by reference, as if fully restated herein, paragraphs 1 through 96 and further states as follows:

98.     The Loan Commitment is a valid and enforceable agreement between GCMA and HSW.

99.     Pursuant to the terms of the Loan Commitment, HSW was obligated to, among other things: (i) "use reasonable good faith efforts to meet the Loan goals of the Fund and its EB-

5 investors, including the material terms and conditions of [the Loan] Commitment"; (ii) permit GCMA to use its reasonable best efforts to raise the fund capital without interference or obstruction from HSW, unless and until HSW issued a Loan Cut Off Notice in accordance with the Loan Commitment; (iii) act in good faith in connection with, and reasonably cooperate with GCMA's efforts to, raise up to $100 Million (reduced from $230 Million) in accordance with the terms of the to-be-agreed-upon Loan Documentation; (iv) negotiate the Loan Documentation for the Loan as provided in the Loan Commitment in good faith and in accordance and consistent with any Project Documentation; and, (v) so long as any Project Documentation did not somehow preclude HSW from borrowing up to $100 Million in accordance with the terms that were substantially contemplated in the Loan Commitment, borrowing all fund capital raised by GCMA and deposited in escrow by the Effective Date (up to $100 Million) in accordance with the Loan Documentation for the loan as provided in the Loan Commitment.

100.   HSW breached the Loan Commitment by, among other things: (i) acting in bad faith and intentionally sabotaging GCMA's efforts to raise the Fund Capital; (ii) acting in bad faith and intentionally sabotaging the Loan goals of the Fund and its EB-5 investors; (iii) failing to reasonably cooperate with GCMA's efforts to raise the Fund Capital; (iv) refusing to request DMPED to extend (or continue confirmation of) the TEA Designation; (v) refusing to submit a letter of support to DMPED indicating that HSW supports the use EB-5 funds for the project; (vi) issuing a Notice of Default to GCMA alleging breaches of "obligations" that do not even exist under the Loan Commitment; (vii) failing to negotiate in good faith the Loan Documentation for the Loan as provided in the Loan Commitment; (viii) refusing to borrowing all Fund Capital raised by GCMA and deposited in escrow by the Effective Date; (ix) refusing to borrow anything more than $7.5 million of Fund Capital; (x) demanding a reduced interest rate

and more favorable repayment terms than those set forth in the Loan Commitment; and (xi) requiring an arbitrary funding deadline as a condition to any loan from the Fund (especially with knowledge that such a deadline would necessarily result in the ultimate rejection of United States residency status to any EB-5 investor whose I-526 petition had not yet been approved as of the deadline).

101.   In addition to the express duties of good faith set forth within the Commitment Letter, HSW was further obligated to conduct itself in accordance with the implied duties of good faith and fair dealing, which required HSW to, among other things, (i) reasonably cooperate with the Plaintiffs' performance under the Loan Commitment; (ii) not intentionally hinder, interfere with, or otherwise frustrate the Plaintiffs' performance under the Loan Commitment; and (iii) not take any action to intentionally destroy or injure the rights of the Plaintiffs to receive the benefits to which they were entitled under the Loan Commitment.

102.   HSW breached the implied duties of good faith and fair dealing by, among other things: (i) acting in bad faith and intentionally sabotaging GCMA's efforts to raise the Fund Capital; (ii) acting in bad faith and intentionally sabotaging the Loan goals of the Fund and its EB-5 investors; (iii) refusing to cooperate with GCMA's efforts to raise the Fund Capital in a concerted effort to frustrate the Plaintiffs' ability to perform under the Loan Commitment; (iv) refusing to request DMPED to extend (or continue confirmation of) the TEA Designation in order to hinder GCMA's ability to raise the Fund Capital; (v) refusing to submit a letter of support to DMPED indicating that HSW supports the use EB-5 funds for the project in order to hinder GCMA's ability to raise the Fund Capital; (vi) issuing a Notice of Default to GCMA alleging breaches of "obligations" that do not even exist under the Loan Commitment in a bad faith attempt to escape HSW's obligations under the Loan Commitment and to frustrate the

Plaintiffs' ability to receive the benefits of the Loan Commitment; (vii) negotiating the terms of the Loan Documentation in bad faith; (viii) refusing to borrow anything more than $7.5 million of Fund Capital; (ix) demanding a reduced interest rate and more favorable repayment terms than those set forth in the Loan Commitment; and (x) requiring an arbitrary funding deadline as a condition to any loan (especially with knowledge that such a deadline would necessarily result in the ultimate rejection of United States residency status to any EB-5 investor whose I-526 petition had not yet been approved as of the deadline).

103.    As a direct and proximate result of HSW's breaches, GCMA, the Master Series LLC, and the Fund have suffered substantial damages.

WHEREFORE, Plaintiffs, Global Capital Markets Advisors, LLC, CARc Job Fund-I, LLC, and CARc Job Fund – The Wharf Project Loan Series, LLC request that this Honorable Court enter judgment in their favor and against the Defendant, Hoffman-Struever Waterfront, LLC in an amount in excess of $75,000.00.

## COUNT III – PERMANENT INJUNCTION

104.    GCMA incorporates by reference, as if fully restated herein, paragraphs 1 through 103 and further states as follows:

105.    GCMA has made repeated demands to HSW to file the required documents to continue The Wharf's designation as within an officially designated Targeted Employment Area.

106.    Despite GCMA's repeated demands, HSW has refused and continues to refuse to file the required documents with DMPED.

107.    GCMA has contacted DMPED regarding The Wharf's designation as a Targeted Employment Area.   DMPED responded by stating that HSW needed to merely issue a letter

supporting the use of EB-5 capital in the project. HSW responded by declaring GCMA in default of the Loan Commitment.

108.   HSW's conduct is a breach of the express terms of the Loan Commitment and the implied covenant of good faith and fair dealing in the Loan Commitment.

109.   Pursuant to the terms of the Loan Commitment, HSW was obligated to, among other things: (i) "use reasonable good faith efforts to meet the Loan goals of the Fund and its EB-5 investors, including the material terms and conditions of [the Loan] Commitment"; (ii) permit GCMA to use its reasonable best efforts to raise the fund capital without interference or obstruction from HSW, unless and until HSW issued a Loan Cut Off Notice in accordance with the Loan Commitment; (iii) act in good faith in connection with, and reasonably cooperate with GCMA's efforts to, raise up to $100 Million (reduced from $230 Million) in accordance with the terms of the to-be-agreed-upon loan documentation Loan Documentation; (iv) negotiate the Loan Documentation for the Loan as provided in the Loan Commitment in good faith and in accordance and consistent with any Project Documentation; and, (v) so long as any Project Documentation did not somehow preclude HSW from borrowing up to $100 Million in accordance with the terms that were substantially contemplated in the Loan Commitment, borrowing all fund capital raised by GCMA and deposited in escrow by the Effective Date (up to $100 Million) in accordance with the Loan Documentation for the loan as provided in the Loan Commitment.

110.   HSW breached the Loan Commitment by, among other things: (i) acting in bad faith and intentionally sabotaging GCMA's efforts to raise the Fund Capital; (ii) acting in bad faith and intentionally sabotaging the Loan goals of the Fund and its EB-5 investors; (iii) failing to reasonably cooperate with GCMA's efforts to raise the Fund Capital; (iv) refusing to request

DMPED to extend (or continue confirmation of) the TEA Designation; (v) refusing to submit a letter of support to DMPED indicating that HSW supports the use EB-5 funds for the project; (vi) issuing a Notice of Default to GCMA alleging breaches of "obligations" that do not even exist under the Loan Commitment; (vii) failing to negotiate in good faith the Loan Documentation for the Loan as provided in the Loan Commitment; (viii) refusing to borrowing all Fund Capital raised by GCMA and deposited in escrow by the Effective Date; (ix) refusing to borrow anything more than $7.5 million of Fund Capital; (x) demanding a reduced interest rate and more favorable repayment terms than those set forth in the Loan Commitment; and (xi) requiring an arbitrary funding deadline as a condition to any loan from the Fund (especially with knowledge that such a deadline would necessarily result in the ultimate rejection of United States residency status to any EB-5 investor whose I-526 petition had not yet been approved as of the deadline).

111. In addition to the express duties of good faith set forth within the Commitment Letter, HSW was further obligated to conduct itself in accordance with the implied duties of good faith and fair dealing, which required HSW to, among other things, (i) reasonably cooperate with the Plaintiffs' performance under the Loan Commitment; (ii) not intentionally hinder, interfere with, or otherwise frustrate the Plaintiffs' performance under the Loan Commitment; and (iii) not take any action to intentionally destroy or injure the rights of the Plaintiffs to receive the benefits to which they were entitled under the Loan Commitment.

112. HSW breached the implied duties of good faith and fair dealing by, among other things: (i) acting in bad faith and intentionally sabotaging GCMA's efforts to raise the Fund Capital; (ii) acting in bad faith and intentionally sabotaging the Loan goals of the Fund and its EB-5 investors; (iii) refusing to cooperate with GCMA's efforts to raise the Fund Capital in a

concerted effort to frustrate the Plaintiffs' ability to perform under the Loan Commitment; (iv) refusing to request DMPED to extend (or continue confirmation of) the TEA Designation in order to hinder GCMA's ability to raise the Fund Capital; (v) refusing to submit a letter of support to DMPED indicating that HSW supports the use EB-5 funds for the project in order to hinder GCMA's ability to raise the Fund Capital; (vi) issuing a Notice of Default to GCMA alleging breaches of "obligations" that do not even exist under the Loan Commitment in a bad faith attempt to escape HSW's obligations under the Loan Commitment and to frustrate the Plaintiffs' ability to receive the benefits of the Loan Commitment; (vii) negotiating the terms of the Loan Documentation in bad faith; (viii) refusing to borrow anything more than $7.5 million of Fund Capital; (ix) demanding a reduced interest rate and more favorable repayment terms than those set forth in the Loan Commitment; and (x) requiring an arbitrary funding deadline as a condition to any loan (especially with knowledge that such a deadline would necessarily result in the ultimate rejection of United States residency status to any EB-5 investor whose I-526 petition had not yet been approved as of the deadline).

113.   Unless HSW is restrained from breaching the Loan Commitment and is compelled to comply with the Loan Commitment as set forth herein, then GCMA, the Master Series LLC, the Fund and its EB-5 Investors will suffer irreparable harm.

114.   Specifically, GCMA's reputation, good will and name will be irreparably tarnished, GCMA will go out of business, the Fund will cease to exist, the investors in the Fund will all be denied residency in the United States, and GCMA, the Fund and HSW will be subjected to liability to the Fund's EB-5 investors.

115.   The benefits to the Plaintiffs in obtaining this injunction far outweigh the prejudice to HSW in that the injunction will maintain the status quo as to the parties' respective

obligations, prevent irreparable harm and damage to the Fund Investors, prevent damage to the international reputation of the EB-5 Immigration Program, prevent the irreparable loss of reputation and good will to GCMA and the Fund, and prevent GCMA from being put out of business as a result, while not causing any loss or hardship to HSW whatsoever.  To the contrary, HSW will have access to capital investment funds at below market loan rates on the express terms they originally agreed to in the Loan Commitment.

WHEREFORE, Plaintiffs, Global Capital Markets Advisors, LLC, CARc Job Fund-I, LLC, and CARc Job Fund – The Wharf Project Loan Series, LLC request that this Honorable Court enter a permanent injunction requiring Defendant to perform its obligations under the Loan Commitment in good faith, to request the continuance of The Wharf's designation as a Targeted Employment Area, negotiate the Loan Documentation for the Loan as provided in the Loan Commitment in good faith and in accordance and consistent with any Project Documentation, and, borrow all fund capital raised by GCMA and deposited in escrow by the Effective Date (up to $100 Million) in accordance with the Loan Documentation for the loan as provided in the Loan Commitment.

Respectfully submitted,

*/s/ Geoffrey G. Hengerer*
Geoffrey G. Hengerer (DC Bar No. 495994)
Ramsay M. Whitworth (Pro Hac Vice Pending)
Silverman Thompson Slutkin & White, LLC
201 N. Charles Street, 26th Floor
Baltimore, Maryland 21201
Tel: (410) 385-2225
Fax: (410) 547-2432

*Attorneys for Plaintiff*